Richard J. Mooney (CA SBN 176486)
*richard.mooney@rjmlitigation.com*
RJM LITIGATION GROUP
505 Montgomery St. #1100
San Francisco, CA  94104
Telephone:  (415) 874-3711

Attorneys for Plaintiff Steven Marcus

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Steven Marcus,<br><br>               Plaintiff,<br><br>     v.<br><br>Alexandria Real Estate Equities, Inc.,<br>Joel S. Marcus, and Gary Dean,<br><br>               Defendants. | CASE NO.  _____<br><br>Complaint for Fraud, Fraudulent Concealment, and Declaratory Relief |

Plaintiff Steven Marcus alleges for his Complaint against Alexandria Real Estate Equities, Inc. ("ARE"), Joel Marcus, and Gary Dean (collectively, "Defendants") as follows:

### Introduction

1.    This dispute revolves around intentionally false statements made by Defendant Joel Marcus, while Chairman and CEO of Defendant ARE, and Gary Dean, while a high level legal officer of ARE, as part of Defendants' campaign to mislead and pressure Plaintiff Steven Marcus into signing what purports to be a Confidentiality and Non-Disclosure Agreement (the "Alleged Steven Marcus CNDA") with ARE.  The fraudulent concealment was in fact successful inducing Steven Marcus into signing the agreement on December 30, 2013.  In 2019, Defendants used the Alleged Steven Marcus CNDA, which Steven Marcus would not have signed absent Joel Marcus's and Gary Dean's false statements, as the basis for a lawsuit against Steven Marcus in the California Superior Court for the County of Los Angeles.  Defending that lawsuit, which could not have occurred absent the false statements and subsequent signature to the Alleged Steven Marcus CNDA, has caused Steven damages well exceeding $100,000, and Plaintiff seeks to recover those damages (and punitive damages) here, along with a declaration that the fraud and associated economic and personal coercion leading to the signing of the Alleged Steven Marcus CNDA renders it void and unenforceable.

### The Parties

2.    Plaintiff Steven Marcus is a citizen and resident of the United Kingdom.

3.    ARE is a corporation organized and existing under the laws of Maryland, with its principal place of business in Pasadena, California.

4.    Joel S. Marcus is a United States citizen domiciled in California, and is the Executive Chairman of ARE.

5.      Gary Dean is a United States citizen domiciled in California, and is Executive Vice President – Real Estate Legal Affairs, and appears from ARE's website to be the second-ranking legal official at ARE.

### Jurisdiction and Venue

6.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, as it involves parties of diverse citizenship and the amount in controversy, excluding costs and fees, exceeds $75,000.

7.      This Court has personal jurisdiction over ARE because ARE's principal place of business is in Pasadena, California.

8.      This Court has personal jurisdiction over Joel S. Marcus because he is a resident of Beverly Hills, California.

9.      This Court has personal jurisdiction over Gary Dean because he is a resident of California.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because all Defendants are residents of this State and District.

### Factual Allegations

11.     From 2010 through 2013, ARE under the leadership of Joel Marcus was in a downward spiral.  From January 4, 2010 to November 25, 2013, the three years prior to Bugsby's intervention, ARE's stock underperformed the Vanguard REIT Index (VNQ) of closely comparable stocks by (47.38)%.  ARE's total common shares during this same period grew from 48,405,040 to 71,081,000, a dilution of nearly 47% (almost exactly in line with the share underperformance).  In an industry that tends to have closely correlated returns, ARE was significantly trailing behind its peers. By the end of 2013, ARE traded at a laggard 15-times earnings while most REIT competitors traded at around 20-times earnings – a massive and persistent discount that would jeopardize any public company's management team.

12.     By the middle of 2013, ARE's investors were in open revolt.  In ARE's "Say on Pay" vote, investors sent an unmistakable message about their dissatisfaction.  Despite the company's share price stagnation, management was taking home some of the highest compensation packages in the industry.  When put to this Say on Pay vote, management 'failed', as only 9% voted in favor of management's compensation, a sharp decline from the 2012 vote resulting in 80% approval.  The 9% approval vote was a stunning outlier compared to industry and US corporate norms.  By comparison, only seven companies in the S&P 500 'failed' Say on Pay votes that year (*i.e.*, received fewer than 50% of votes for approval), and all those companies failed only by a narrow margin with an average support rate of 44%.  This result for ARE's management, led by Joel Marcus, left it in the bottom 1% of all publicly-traded companies.

13.     Recognizing an existential threat to his position as Chairman and CEO (and, thus, his eight-figure annual income and stock holdings), Joel Marcus needed help.  He was facing pressure from independent board members who wanted to strip his inflated pay package to appease investors after an unacceptable Say on Pay vote.  Joel Marcus therefore approached Steven Marcus over the 2013 Thanksgiving holiday to request help from Bugsby Property LLC ("Bugsby"), of which Steven was the Manager, proposing that Bugsby provide advisory services to both Joel Marcus and ARE, with the aim of producing a new capital strategy to improve ARE's share price, satisfy its investors, and save Joel Marcus's position as Chairman and CEO.

14.     Joel Marcus and Alexandria understood the difference between Steven Marcus, the individual, and Bugsby, the company of which he was Manager. Joel was, from August to October 2013 (directly before the events at issue here), Lead Advisor to Bugsby and actively worked with Bugsby during negotiations to invest in, raise capital for, and lead a development for a film studio complex in east London

(often appearing as Lead Advisor in Bugsby's presentations).  At the time, Joel Marcus offered endorsements of Bugsby to the highest offices in major investment banks and real estate allocators.  Indeed, Joel Marcus thought so highly of Bugsby that he described its Greenwich project in an email to senior Goldman Sachs executives as a "once in a lifetime transaction" that would "blow u away."[1]

15.    In ARE's and Joel Marcus's desperate hour, Bugsby agreed to provide the requested advisory services, which it did in late November and the initial part of December 2013.  Based on Bugsby's long-term knowledge overlay; discussions with the major Wall Street analysts covering ARE and with ARE shareholders; and Bugsby's own primary research, Bugsby was able to quickly identify the root causes of ARE's stagnation.  In particular, ARE's strategy between 2010 and 2013 had focused on maintaining balance sheet leverage ratios at the expense of FFO per share, issuing dilutive common stock to fund growth rather than using debt or strategic joint ventures and private capital, resulting in persistent share price underperformance.

16.    Having identified the root causes, Bugsby recognized and articulated a compelling way to shift capital strategy to benefit shareholders:  ARE should create a large (hundreds of millions or billions of dollars), programmatic, strategic joint venture with a private institutional investor rather than raise capital through public share issuance.  This would leverage ARE's core capabilities and lift earnings (FFO) per share, the primary metric analysis and the market used to determine ARE's true value.

---

[1]    Further, Joel Marcus knew (and knows today) that Bugsby business was always conducted on Bugsby email, and personal discussions between father and son strictly on Steven's Gmail account.

17.     On the evening of December 4, 2013, at 6:02 p.m., while both Bugsby and ARE management were still in New York City (following ARE's Investor Day presentation and before the equity analysts had published their notes), Bugsby emailed Joel Marcus of ARE the outline of the Bugsby Blueprint.  The contrast in strategic thinking from ARE's presentation the very same day could not have been more pronounced.  As priority number one, Bugsby highlighted:  "*strategic jv / co invest partner (250-500 mm) to replace common [stock] issue.*"  Bugsby's December 4 email was clear in its diagnosis of ARE's problems and its elegant solution, clearly and succinctly detailing its powerful plan to replace dilutive common equity with joint venture capital and to address a broader group of investors to improve shareholder perception and valuation.

18.     On December 7, 2013, Bugsby sent a "Bugsby Blueprint", captured in a powerpoint presentation, summarizing its analysis and recommendations to select members of ARE's management, including Joel Marcus.  Immediately after reviewing the Bugsby deck, on December 8, Joel Marcus declared that the Bugsby Blueprint was "going to be a big thing for ARE!"

19.     Also on December 8, Bugsby continued the development and refinement of its advice to ARE by proposing the specifics of proposed transactional structures to implement the strategic joint venture / co-investment element of the Bugsby Blueprint to Joel Marcus of ARE.  In an email from the same day, it shared: "you [ARE] would get a management fee and a promote [for a joint venture];" continuing that Bugsby "will work on a structure," as it had been asked to do.

20.     The final development of the strategic joint venture and co-investment element of the Bugsby Blueprint, continued substantively on December 19, 2013 in New York City, including in meetings led and arranged by Bugsby's

Steven Marcus, and attended by ARE's Joel Marcus, and senior investment banking teams from Goldman Sachs and JPMorgan who were to implement Bugsby's advice.

21.    It was on December 19 that Joel first asked Bugsby to "remove Bugsby stuff" from the materials being sent to Goldman Sachs and JPMorgan. Contrary to Joel's later claims, the request was not couched as "your name should be on it because you did it personally", but rather because Joel was upset and JPMorgan and Goldman would know that it was Bugsby's work and ideas, and not his own, confirming Joel's leadership failures to that point.  Notably, Bugsby declined the request to remove its name from the Bugsby Blueprint documents sent to JPMorgan and Goldman Sachs and made no change in response, and nor did it edit any documents to this effect.  Bugsby's involvement in developing and communicating its conclusions and recommendations ended by December 20, 2013, after this off-putting and misplaced request.

22.    Indeed, from the other side of his mouth, by December 21, 2013, Joel Marcus told a full team of ARE executives (including CFO Dean Shigenaga and CIO Peter Moglia (now co-CEO) and JP Morgan bankers that the ideas delivered by Bugsby had ARE's "highest corporate attention".

23.    Bugsby's role in evaluating ARE's difficulties and recommending a new strategic approach was complete by December 20, 2013, and no services were performed for or advice provided to ARE after that date.

24.     Subsequently, there was discussion of the possibility of Bugsby (which declined) – or Steven individually – assisting ARE on a *forward-looking basis* with the *implementation* of the previously-provided Bugsby Blueprint advice, in an ARE project code-named "Project Affirmed". The implementation discussion ended up merely being a cover story for ARE to procure a signed agreement which they could use in future litigation, as 'limited' if any work was intended by ARE.

25.     ARE's attorney Gary Dean in the late days of December 2013 prepared two proposed Confidentiality and Non-Disclosure Agreements, with the covering email of December 27th stating "Per the request of Joel Marcus, I attach two Confidential Information and Non-Disclosure Agreements.  If acceptable, please sign and return a PDF copy."  Steven Marcus had never spoken with Mr. Dean prior to that email, and only spoke with him on one occasion altogether.

26.     One of the proposed agreements was with Steven, which after modifications discussed below would become the Alleged Steven Marcus CNDA. The other was a proposed agreement with Bugsby (the "Bugsby Potential CNDA"), which was not agreed to by Bugsby because Bugsby did not intend to perform any further work for ARE.

27.     In particular, the Bugsby Potential CNDA was a proposed agreement between ARE and Bugsby pursuant to which Bugsby would agree to maintain the confidentiality of any information ARE provided Bugsby in the course of Project Affirmed, with the added proviso that Bugsby would not be paid for any work it might perform on Project Affirmed after the agreement went into effect.  After ARE sent the Bugsby Potential CNDA, however, Bugsby decided that although it had developed and provided the Bugsby Blueprint, it would not be involved in the implementation of the Bugsby Blueprint's recommendations (*i.e.*, Project Affirmed). Bugsby therefore did not execute the Bugsby Potential CNDA.  Bugsby clearly conveyed its decision not to execute the Bugsby Potential CNDA, along with the reasons for that decision, to ARE, Steven Marcus, and Gary Dean.  Each of them accepted and agreed to that decision.

28.     Joel Marcus wanted to get a CNDA signed at all costs, and reached out to his son by email, stating "*gary sent you doc last week! pls execute asap*". Although Bugsby refused to sign, he insisted that there were important reasons for

Steven to continue personally with the implementation work and most importantly to sign a CNDA, not least of which was ARE's policies toward related parties.

29.     Gary Dean confirmed Bugsby's decision in an email to Steven Marcus on his individual Gmail account on December 30, 2013 by saying "I understand that you *will be advising/consulting in your individual capacity* and, as a result, deleted the CNDA with Bugsby Property."  (Emphasis added.)  His statement also correctly conveys that the Alleged Steven Marcus CNDA (inasmuch as it were valid) could only and always was only intended to apply on a forward-looking basis for Steven Marcus's individual work from December 27, 2013.

30.     The first draft of the Alleged Steven Marcus CNDA (like the draft of the Bugsby Potential CNDA) was prepared by ARE's senior legal officer Gary Dean and sent by electronic mail to Steven Marcus.  The draft Alleged Steven Marcus CNDA had terms that were similar to those in the Bugsby Potential CNDA, *viz.*, that ARE would provide to Steven certain putatively confidential information for Steven's potential use in assisting with the implementation of the Bugsby Blueprint's recommendations (*i.e.*, Project Affirmed), that Steven would maintain the confidentiality of that information, and that Steven would not receive cash compensation for his work on Project Affirmed.

31.     Significantly, the initial draft of the Alleged Steven Marcus CNDA provided by Mr. Dean to Steven Marcus proposed that the agreement would be retroactive – *i.e.*, that it would cover the time period prior to the signing of the document, back at least until November 2013.  Because Steven had not yet provided *any* work to ARE, let alone work implementing the Bugsby Blueprint (the Bugsby Blueprint itself had not been completed until December 19 or 20, and no implementation efforts had begun at the time by any party when the draft was exchanged, and ARE had not provided Steven any confidential information, Steven

stated clearly by phone and in contemporaneous redline that he was unwilling to sign a document that purported to be retroactive.

32.     Gary Dean stated to Steven that he agreed that the Alleged Steven Marcus CNDA would not be retroactive and the draft was then changed to have an Effective Date of December 27, 2013, and to apply only to putatively confidential ARE information "to be provided" after that date and to potential advice by Steven "to be provided" after that date.  The redline and final versions of the Alleged Steven Marcus CNDA reflect this agreement change – that the document is fully prospective and *forward-looking* in its terms, and applying only to Steven Marcus individually.

33.     In that same communication, however, Gary Dean intentionally concealed from Steven the fact that Mr. Dean actually and always intended for the Alleged Steven Marcus CNDA to apply retroactively and to use it as a litigation tool to sue Steven Marcus for an alleged million dollars of ARE's corporate legal fees based on *past events* that occurred prior to the document being signed (on December 30) and prior to its effective date (of December 27).

34.     Steven Marcus only learned of Mr. Dean's lie earlier this year, when he stated in a declaration sworn under penalty of perjury that in his own mind, notwithstanding the negotiated changed language as signed, "*the [Alleged Steven Marcus] CNDA was meant to apply to, and did apply to, all work done before or after the [Alleged Steven Marcus] CNDA was signed*."

35.     Steven reasonably relied upon the statement by Mr. Dean that the putative agreement would only apply to *future* events, particularly given that Mr. Dean and Steven Marcus specifically agreed and then Mr. Dean changed the language in the draft document to confirm Mr. Dean's statement.  Steven only learned of Mr. Dean's fraud from the August 2021 sworn declaration of Mr. Dean mentioned

above.  If Steven had known of Mr. Dean's covert interpretation and intention, he would not have signed the Alleged Steven Marcus CNDA.

36.     Notably, this was not Mr. Dean's only intentionally false sworn statement, as he has also testified under oath that the Alleged Steven Marcus CNDA applied to Bugsby's work performed up through December 20, a full week before Mr. Dean even drafted and send the putative agreement.  This false statement was made *notwithstanding that Bugsby explicitly refused to enter into the Proposed Bugsby CNDA that Mr. Dean sent Bugsby*, and Mr. Dean's own email at the time reflecting his understanding that Bugsby was not agreeing to a CNDA of any type nor advising or consulting further.

37.     Indeed, this claim that the Alleged Steven Marcus CNDA applied to Bugsby and Bugsby's earlier work is directly contradicted by the plain language of the document Mr. Dean drafted himself, which (1) provides that the parties to the putative agreement are ARE and "Steven Marcus, *an Individual*"; (2) includes no language extending the putative agreement to affiliates of Steven Marcus (while applying to affiliates of ARE); (3) clearly states that the Permitted Use is prospective, for "advice to be provided"; (4) states in paragraph 15 that "Neither party shall assign or transfer any rights or obligations under this Agreement"; and (5) states in paragraph 18 that "This Agreement is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein."

38.     Also as part of the discussions leading up to the signing of the Alleged Steven Marcus CNDA, Steven's father Defendant Joel Marcus (acting both for his own interest and for the interest of ARE, of which he was then the Chairman and CEO) himself used fraud in a successful attempt to persuade Steven Marcus to sign the Alleged Steven Marcus CNDA.

39.     Specifically, Joel told Steven that the provision of the Alleged Steven Marcus CNDA stating that Steven would be provided no compensation "unless otherwise agreed" was a required part of the agreement because ARE had an "anti-nepotism" policy that made it impossible for ARE to provide compensation to Steven. He also indicated to Steven that "unless otherwise agreed" left the opportunity to discuss compensation in the future open.

40.     Joel Marcus's December 30, 2013 email stated clearly (and falsely):

> *"We are a public company and we have a specific policy against hiring family (dating to 2009) so I must send this as standard fare re risk mgmt.  Don't take it personally and has zero re my love and trust in you!"*

41.     That statement (repeated more than once to Steven Marcus in December 2013) was an intentional lie.  As Joel knew, there was no such policy at ARE.  To the contrary, the only potentially relevant "anti-nepotism policy" required only that such payments could not be secretly and unilaterally agreed by a single executive (such as Joel Marcus or Gary Dean); rather, such compensation was completely permissible if properly ratified by the company.

42.     Steven reasonably accepted Joel's false statement as being true, and reasonably relied on it, as the statement was made by the Chairman and then-CEO of the company (who thus could be expected to know) and by his own father – who thus could – at that time at least – be expected not to lie to his son in an effort to harm him.

43.     In the absence of Joel's false statement, if Steven had known the actual truth about ARE's policy, he would not have agreed to or signed the Alleged Steven Marcus CNDA.

44.    Indeed, Steven Marcus explicitly stated his reliance on Joel Marcus's statement regarding ARE's related parties policy in the email string attached to the signed Alleged Steven Marcus CNDA itself, writing as follows: "Re compensation, I have not and will not seek compensation for this specific work / project given the below [re the alleged policy] and per our agreement on Friday."

45.    Although Joel Marcus has previously asserted that his lie was unimportant because Steven could have discovered the actual policy by reviewing ARE's publicly-filed Proxy Statement, this assertion (and admission that his statement as made was in fact false) is completely unreasonable given that the lie was made with the demand that Steven Marcus sign the document in a matter of hours at most.

46.    Joel Marcus's intentional lie is not justified by the fact that if his son Steven Marcus had disbelieved the statement and searched for and reviewed the entirety of a 2010 ARE Proxy Statement to see if it included the actual policy he might theoretically have learned the actual truth.  Indeed, as confirmed in the email string attached to the Complaint, Gary Dean pressured Steven as follows: "Please note that Joel has a Project Affirmed conference call tomorrow.  Thus, please sign and deliver ASAP.  If we do not receive shortly, we will have to cancel tomorrow's call."

47.    In addition to lying about ARE policy in an attempt to fraudulently induce Steven Marcus to sign Alleged Steven Marcus CNDA, Joel Marcus imposed severe financial and professional pressure on Steven Marcus to sign the Alleged Steven Marcus CNDA.  In particular, in late December 2013, Joel Marcus repeatedly outlined significant and proximate financial and reputational threats to Steven Marcus if he did not "play along" and sign the Alleged Steven Marcus CNDA.

48.    Those threats included among other things a threat to exercise his veto right over substantial income and capital gains to be realized (a previously agreed) by Unit Six Owners LLC, a company that jointly owned by Joel Marcus and

Steven Marcus as Members.  Implementation of that clear threat would have deprived Steven and his young family of vital rental income, upon which they relied at the time, as well as capital gains for investment and professional development.  That threat alone was enough to have caused Steven Marcus and his family substantial and immediate personal and professional harm.

49.     In addition, at the same breakfast and in other contemporaneous communications, Joel Marcus threatened Steven Marcus with additional reputational harm if he did not sign the Alleged Steven Marcus CNDA.  Joel Marcus explicitly stated that in his position as long-standing real estate executive and, importantly, as Steven's father and thus someone who would ostensibly know him well and be in a position of trust, he would (absent compliance with his signature demand) speak ill of Steven Marcus to industry participants, including investment bankers and public and private real estate investors.

50.     Further, Joel Marcus threatened Steven Marcus with litigation if his signature demands were not met.  This was a serious and fearsome threat given Joel Marcus and ARE's long history of litigation against former employees and related parties.  Several of those lawsuits had been tactically employed to intimidate, disparage, and defame perceived enemies, commonly using baseless claims (filed under legal privilege) to force lengthy, unjustified, and open-ended discovery designed to create unjustified expense and obtain information to be deployed for the purpose of creating reputational harm, going to far in at least one case as to petition a public court to confirm a private arbitration award where ARE *had lost*, solely to permit public distribution of information.  Indeed, Joel Marcus had previously bragged to Steven Marcus – as well as other bankers and institutional investors – that he had used litigation to chase one ARE co-founder "to the end of the earth" with litigation.

51.     Absent the coercion detailed above, Steven Marcus would not have the Alleged Steven Marcus CNDA.

52.     In the end, despite Defendants' lies and improper pressure leading Steven to sign the Alleged Steven Marcus CNDA, nothing actually happened pursuant to the alleged agreement.  No such confidential information was ever provided by ARE (indeed, no information was provided at all), and no such advice was ever given.  The putative agreement thus remained unmentioned for years.  Thus, the Alleged Steven Marcus CNDA (which, even if it were a legitimate, viable, and enforceable agreement) applied only to conduct on or after its December 27, 2013 Effective Date, has and should have had no application to anything.

53.     Nearly five years later, however, on December 13, 2018, ARE (acting at the behest of Joel Marcus) filed a frivolous trademark lawsuit against Steven Marcus and two RUNLABS companies of which he was the principal in an ultimately unsuccessful attempt by Joel Marcus to interfere with and impeded the fundraising efforts for those companies.  That lawsuit, filed in the United States District Court for the Northern District of California, was promptly dismissed with prejudice, and ARE could contrive no basis for asserting an appeal.

54.     Notably, the complaint stated in pertinent part that "Steven Marcus has never been an employee or had any formal business relationship with Alexandria, nor has he had any other interest in Alexandria aside from his familial relationship with Joel Marcus."  That allegation is directly inconsistent with ARE's current assertions, and Joel Marcus's and Gary Dean's recent sworn statements that Steven entered into a binding Alleged Steven Marcus CNDA and provided work to ARE pursuant to that putative agreement.

55.     In addition, Defendants subsequently weaponized the Alleged Steven Marcus CNDA in a lawsuit brought in the California Superior Court for the

County of Los Angeles (the "State Court Lawsuit").  In that lawsuit, the Defendants here have sued Steven Marcus for (1) breaching the Alleged Steven Marcus CNDA by participating in an effort by *Bugsby* (which explicitly declined to enter a similar agreement) to obtain compensation for the work that it did *prior* to the putative agreement entering into force; and (2) defrauding Defendants by participating in an effort by *Bugsby* (which explicitly declined to enter a similar a non-signatory) to obtain compensation for the work that it did *prior* to the agreement entering into force.[2]  The State Court Lawsuit is dependent upon Steven Marcus having signed the Alleged Steven Marcus CNDA, which he would not have done absent the false statements by ARE and its senior officers Joel Marcus and Gary Dean.

56.     Although the State Court Lawsuit is without merit and Steven Marcus expects that it will be resolved on summary judgment, Steven Marcus has still suffered significant damages in the form of the attorneys fees incurred in defending that action.

## First Cause of Action – Fraud (Joel Marcus and ARE)

57.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

58.     Joel Marcus, acting both as an individual and as the most senior executive of and on behalf of ARE, made the intentionally false statements to Steven Marcus described above.

59.     Joel Marcus's statements were knowingly false when made.

---

[2]     Joel Marcus and ARE initially named Bugsby as a party to the State Court Litigation, but Bugsby was dismissed for lack of personal jurisdiction and that dismissal was affirmed on appeal.

60.     Joel Marcus and ARE intended for Steven Marcus to rely on the false statements when made, and Steven Marcus did in fact reasonably rely on those statements in executing the Alleged Steven Marcus CNDA.

61.     As a direct result of Joel Marcus and ARE's false statements, Steven Marcus suffered damages in an amount to be determined at trial, reasonably expected to exceed $100,000.

62.     In acting as described herein, Joel Marcus and ARE acted with oppression, fraud, and/or malice, justifying the imposition of punitive/exemplary damages as set out in California Civil Code section 3294.

## Second Cause of Action – Fraud (Gary Dean and ARE)

63.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

64.     Gary Dean, acting both as an individual and as a senior legal officer of and on behalf of ARE, made the intentionally false statements to Steven Marcus described above.

65.     Gary Dean's statements were knowingly false when made.

66.     Gary Dean and ARE intended for Steven Marcus to rely on the false statements when made, and Steven Marcus did in fact reasonably rely on those statements in executing the Alleged Steven Marcus CNDA.

67.     As a direct result of Gary Dean and ARE's false statements, Steven Marcus suffered damages in an amount to be determined at trial, reasonably expected to exceed $100,000.

68.     In acting as described herein, Joel Marcus and ARE acted with oppression, fraud, and/or malice, justifying the imposition of punitive/exemplary damages as set out in California Civil Code section 3294.

## Third Cause of Action – Fraudulent Concealment (Joel Marcus and ARE)

69.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

70.     Joel Marcus, acting as the most senior executive of and on behalf of ARE, made the intentionally false statements to Steven Marcus described above.

71.     Further, Joel Marcus, acting as the most senior executive of and on behalf of ARE, intentionally concealed from Steven Marcus the true facts concerning ARE's actual "anti-nepotism" policy.

72.     Joel Marcus and ARE intended to deceive Steven Marcus by concealing the highly-relevant information, and Steven Marcus reasonably relied on the absence of the actual information in executing the Alleged Steven Marcus CNDA.

73.     Had the concealed facts been disclosed, Steven Marcus would not have signed the Alleged Steven Marcus CNDA.

74.     As a direct result of Joel Marcus and ARE's concealment, Steven Marcus suffered damages in an amount to be determined at trial, reasonably expected to exceed $100,000.

75.     In acting as described herein, Joel Marcus and ARE acted with oppression, fraud, and/or malice, justifying the imposition of punitive/exemplary damages as set out in California Civil Code section 3294.

## Fourth Cause of Action – Fraudulent Concealment (Gary Dean and ARE)

76.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

77.     Gary Dean, acting both as an individual and as a senior legal officer of and on behalf of ARE, made the intentionally false statements to Steven Marcus described above.

78.     Further, Gary Dean, acting both as an individual and as a senior legal officer of and on behalf of ARE, intentionally concealed from Steven Marcus his and ARE's actual intention to treat the Alleged Steven Marcus CNDA as covering past conduct.

79.     Gary Dean and ARE intended to deceive Steven Marcus by concealing the highly-relevant information, and Steven Marcus reasonably relied on the absence of the actual information in executing the Alleged Steven Marcus CNDA.

80.     Had the concealed facts been disclosed, Steven Marcus would not have signed the Alleged Steven Marcus CNDA.

81.     As a direct result of Gary Dean and ARE's concealment, Steven Marcus suffered damages in an amount to be determined at trial, reasonably expected to exceed $100,000.

82.     In acting as described herein, Gary Dean and ARE acted with oppression, fraud, and/or malice, justifying the imposition of punitive/exemplary damages as set out in California Civil Code section 3294.

### Fifth Cause of Action – Declaratory Relief (ARE)

83.     Plaintiff re-alleges and incorporates herein all preceding paragraphs.

84.     An actual controversy has arisen and now exists between Plaintiff and ARE concerning their respective rights and duties (if any) related to the Alleged Steven Marcus CNDA.  Indeed, on the basis of the Alleged Steven Marcus CNDA, ARE claims that it is entitled to recover hundreds of thousands of dollars that it has paid for the for the work of six attorneys at Gibson Dunn & Crutcher in connection with litigation between the parties.  ARE has not retracted its contention that Steven owes it compensation, and Steven's claim to hundreds of thousands of dollars from

Steven continues to cast significant uncertainty over the parties' rights and duties (if any) related to the Alleged Steven Marcus CNDA.

85.     Plaintiff desires an expeditious judicial determination of the parties' rights and duties (if any) as they pertain to the Alleged Steven Marcus CNDA and a declaration that no compensation is due under that putative agreement.

86.     A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff and ARE may definitively and expeditiously ascertain their rights and duties as they pertain to Steven's demand.

87.     There is now a dispute between the parties as to the validity of the Alleged Steven Marcus CNDA and the terms (if any) of that putative agreement.

## **PRAYER**

Wherefore, Plaintiff prays judgment against Defendants as follows:

1.     for compensatory damages in an amount to be determined at trial;

2.     for punitive damages in an amount to be determined at trial;

3.     for prejudgment interest as permitted by law;

4.     for postjudgment interest as permitted by law;

5.     for declaratory relief as described above;

6.     for costs of suit; and

7.     for such other relief as the Court may deem proper.

Dated:  October 8, 2021                    RJM Litigation Group


                                        _____/s/ Richard Mooney_____
                                        Attorneys for Plaintiff Steven Marcus

## **Demand for Jury Trial**

Plaintiff hereby demands a jury trial for all issues triable to a jury.

Dated:  October 8, 2021                    RJM Litigation Group


_____/s/ Richard Mooney_____
Attorneys for Plaintiff Steven Marcus

Complaint
*Marcus v. Alexandria Real Estate Equities, Inc.* (Case No. _____)